**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JEFFREY LABOW,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 11-1256 (BJR)** |
| ) | |
| **U.S. DEPARTMENT OF JUSTICE,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on a motion for summary judgment by Defendant United

States Department of Justice ("DOJ"). Plaintiff Jeffrey Labow claims that Defendant violated

the Freedom of Information Act ("FOIA") in processing his requests for information. *See*

Complaint, Dkt. # 1; Am. Compl., Dkt. #22. DOJ argues that it has satisfied the statutory

requirements by conducting a reasonable search, producing all responsive documents covered by

the statute, and properly withholding certain documents under statutory exemptions. Def.'s

Mem. of P. & A. in Support of Def.'s Mot. for Summary Judgment ("Def.'s Mem."), Dkt. # 32,

at 1. Having reviewed the parties' briefs together with all relevant materials, the Court grants

Defendant's motion for summary judgment.

## I.      BACKGROUND

In March 2011, Labow requested a copy of "any records pertaining to him" from the FBI.

Compl. ¶ 7. The FBI responded in April 2011 that "no responsive records could be found." *Id.*

¶ 9. After filing an administrative appeal in May 2011, Labow brought suit against the DOJ in

July 2011. *Id.* The DOJ then "located 159 responsive records and released to Plaintiff 60 pages

in part or in whole." Am. Compl. ¶ 12. In June 2012, Labow submitted another FOIA request,

this time "requesting a copy of records referring or relating to a Mr. Kuhn." *Id.* ¶ 24. This request "included a privacy waiver signed by Mr. Kuhn authorizing disclosure of responsive records to Plaintiff." *Id.* Labow then filed an amended complaint, alleging that "[t]he FBI improperly redacted a significant amount of information in the released pages and improperly withheld many pages of information," *id.* ¶ 13, and "the FBI's search for records was inadequate," *id.* ¶ 14. Labow also alleged that the DOJ improperly withheld records pursuant to 5 U.S.C. § 552(c)(1), and that the DOJ's policy to inform a plaintiff that no responsive documents were found when an exclusion to FOIA has been applied allows the DOJ to "mislead the requester about the existence of responsive documents." Compl. ¶ 17; Am. Compl. ¶ 17.

The DOJ has now moved for summary judgment, arguing that that no material facts are in dispute and that it has fulfilled its obligation under the FOIA. The DOJ asserts that it has conducted an adequate search for responsive records, and that it disclosed documents and information not otherwise excluded from production. It further argues that is permitted to withhold information and documents under FOIA Exemptions 1, 3, 6, and 7, and that it has provided a sufficiently detailed affidavit explaining the applicability of those exemptions. In particular, DOJ explains that many of the documents requested by Labow relate to "the vandalism of the Four Seasons Hotel," which was perpetrated by "sixteen individuals wearing masks, black hooded jackets, and sunglasses" who "threw firecrackers and smoke generating pyrotechnic devices in the hotel lobby . . . and paint-filled balloons at sculptures and statues in the lobby" at 2 a.m. 2d Hardy Decl. ¶ 9. The perpetrators also "shattered a large glass window in the hotel" and caused "over $200,000 in damages." *Id.* The DOJ further explains that this incident was investigated as a "Domestic Terrorism investigation[]" and "as anarchist extremism," and that other documents that Labow requests involved "an investigation into an

individual (not plaintiff or Kuhn) suspected of animal rights extremism crimes." 3d Hardy Decl. ¶ 5.

In his opposition, Labow contends that the government failed to justify several FOIA exemptions, and that it had inappropriately applied an exclusion to the FOIA. After the briefing on the motion for summary judgment concluded, the DOJ moved for permission to submit an *ex parte*, *in camera* declaration to address whether an exclusion has been applied, and, if so, whether it was properly applied. Def.'s Mot. for Leave to Submit an *Ex Parte*, *In Camera* Decl. & Mem. in Supp. Thereof at 1. Permission was granted on June 24, 2014. The DOJ then submitted an *ex parte*, *in camera* declaration addressing whether an exclusion was applied and, if so, whether it was applied properly. *See* Notice of Compliance with Court's June 24, 2014 Order, Dkt. #47. This was the third declaration submitted by David M. Hardy, the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division of the FBI, and was submitted in redacted form on the public docket.[1]

II.     ANALYSIS

The FOIA provides "a statutory right of public access to documents and records held by agencies of the federal government." *Pratt v. Webster*, 673 F.2d 408, 413 (D.C. Cir. 1982); *see also* 5 U.S.C. § 552. The statute provides for disclosure of agency records, upon a proper request, unless the information sought falls within any of the nine exemptions. *See* 5 U.S.C. §§ 552(a)(3), (b). Additionally, the FOIA excludes certain categories of information from disclosure. 5 U.S.C. § 552(c); *see also* Memorandum Order, Dkt. # 46.

---

[1] To preserve fairness to Labow, the Court only relied on the public Third Hardy Declaration—rather than the *ex parte* declaration—in its analysis, except in assessing whether an exclusion was applied, and, if so, whether it was applied appropriately.

Most FOIA cases can be resolved on summary judgment.  *See Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).  Summary judgment is granted when there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In a FOIA case, an agency is entitled to summary judgment if it can demonstrate that there are no material facts in dispute as to the adequacy of its search for or production of responsive records.  *Nat'l Whistleblower Ctr. v. U.S. Dep't of Health & Human Servs.*, 849 F. Supp. 2d 13, 21–22 (D.D.C. 2012).

Where a plaintiff challenges the adequacy of a search, "[w]hat the agency must show beyond material doubt is that it has conducted a search reasonably calculated to uncover all relevant documents."  *Id.*  To meet this burden, the agency may submit affidavits or declarations that are "relatively detailed and nonconclusory and . . . submitted in good faith."  *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) (internal quotation marks omitted).  Such agency affidavits "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  *SafeCard Servs. Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks and citation omitted).  "If, however, the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper."  *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).

Where a plaintiff challenges a withholding under 5 U.S.C. § 552(b), an agency must show that any responsive information it has withheld was either exempt from disclosure under one of the exemptions enumerated in 5 U.S.C. § 552(b), or else "inextricably intertwined with" exempt information.  *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C.

Cir. 1977). "Because FOIA challenges necessary involve situations in which one party (the government) has sole access to the relevant information, and that same party bears the burden of justifying its disclosure decisions, the courts . . . require the government to provide as detailed a description as possible—without, of course, disclosing the privileged material itself—of the material it refuses to disclose." *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996). This justification is typically contained in a declaration or affidavit. An agency's affidavits or declarations are presumed to be submitted in good faith. *See SafeCard Servs., Inc.*, 926 F.2d at 1200.

An agency is permitted to assert the applicability of a FOIA exemption on a categorical basis where the "claimed FOIA exemption consists of a generic exclusion, dependent upon the category of records rather than the subject matter which each individual record contains." *Church of Scientology of Cal. v. IRS*, 792 F.2d 146, 152 (D.C. Cir. 1986). Rather, "[w]here, as here, an agency has not described each chunk of redacted text individually but instead has grouped it into a descriptive category, the agency satisfies its obligations under the FOIA only if the context of the redacted material suffices to show that the information withheld falls within the relevant category and hence is truly exempt from disclosure." *Clemente v. FBI*, 741 F. Supp. 2d 64, 81 (D.D.C. 2010) (citing *Schoenman v. FBI*, 604 F. Supp. 2d 174, 197–198 (D.D.C. 2009)). Here, because the agency has made extensive withholdings, it has prepared a coded "*Vaughn* index"— after the case of *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)—that assigns each redaction or withholding a code, and then justifies each code, rather than each individual withholding or redaction. The government has also provided a "summary of justification categories" explaining its coding system. 1st Hardy Decl. at 15–16. Under several of the exemptions, the government further subcategorized the applicable exemption. For

example, Exemption 3, which allows the government to exempt information otherwise protected by another statute, is denoted as (b)(3). *Id.* at 15. Exemption 3 is then subdivided into "(b)(3)-1," which deals specifically with the Pen Register statute, "(b)(3)-2," which deals with Federal Rule of Criminal Procedure 6(e), and "(b)(3)-3," which deals with the National Security Act of 1947. These codes were placed next to each redaction or withholding, and in several places, multiple exemptions were applied.

In the case where a plaintiff fails to raise an objection to the application of an exemption, a court may "deem any challenges to documents withheld pursuant to those exemptions to be forfeited." *Sennett v. Dep't of Justice*, 962 F. Supp. 2d 270, 281 (D.D.C. 2013) (citing *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd* 98 Fed. App'x 8 (D.C. Cir. 2004)). Here, Labow fails to raise an objection in his opposition to the adequacy of the FBI's search, or to withholdings under Exemptions 6, 7(C), or 7(F), as well as several subcategories of Exemptions 7(D) and 7(E).[2] *See* Pl.'s Mem. of P. & A. in Opp'n to

---

[2] Under Exemption 6, "[p]ersonnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" are exempt from disclosure. 5 U.S.C. § 552(b)(6). Under Exemption 7, records that

> (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source . . . [and] information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual

are exempt from disclosure. § 552(b)(7). Labow did not contest the government's use of Exemption 7(D) for the sources that were given an express assurance of confidentiality, *see* Pl.'s Mem. at 26–32 (discussing only whether there was an implied assurance of confidentiality), nor did he explicitly contest the government's use of Exemption 7(E) for "dates and types of investigations," "computer analysis response team ("CART") reports and/or data," "location and identity of FBI and/or Joint Units," "sensitive file numbers," and "FBI secure fax number, internal e-mail address and/or non-public web address," *see* Pl.'s Mem. at 14–22 (discussing

Def.'s Mot. for Summ. J. ("Pl.'s Mem."); Reply Mem. in Further Support of Def.'s Mot. for Summ. J. ("Reply") at 2. Accordingly, because Labow has not raised specific objections to those exemptions, those arguments with respect to the FBI's search and its withholdings under Exemptions 6, 7(C), and 7(F) will be treated as conceded. Similarly, the Court need not consider the applicability of the challenged exemptions for the documents that have been withheld under multiple exemptions, one of which includes Exemptions 6, 7(C), and 7(F) or the unchallenged portions of Exemption 7(D) or 7(E). *E.g.*, *Sennett*, 962 F. Supp. 2d at 282 ("Plaintiff does not separately challenge whether the documents were properly redacted or withheld pursuant to Exemption 7(E). Because there is an independent, unchallenged exemption upon which these few documents could be withheld, the Court will not consider the Exemption 1 challenge.").

A. Exemption 1

Under Exemption 1, records that are "(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order" are exempt from production. 5 U.S.C. § 552(b)(1). In turn, the FBI references Executive Order 13526, 3 C.F.R. 298 (2010), *reprinted in* 50 U.S.C. § 3161 app., which "governs the classification and protection of information that affects the national security," 1st Hardy Decl. ¶ 39. Under Executive Order 13526, if "unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security in accordance with section 1.2 of this order, and it pertains to[,]" as relevant here, "(b) foreign government information; (c) intelligence activities (including covert action), intelligence sources or methods, or cryptology; [or] (d) foreign relations or foreign activities of the United States, including confidential sources[,]" then the

---

only (b)(7)(E)-1 explicitly and obliquely referring to the FBI's redaction of database information, denoted as (b)(7)(E)-3, and surveillance activity, denoted by the government as (b)(7)(E)-6.

information may be properly classified. Exec. Order 13526 § 1.1(a)(4). An agency may only reclassify information after receiving an information request "if such classification meets the requirements of this order and is accomplished on a document-by-document basis with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under section 5.4 of this order." Exec. Order 13526 § 1.7(d).

Declarations—such as the Hardy Declaration presented here—are afforded "substantial weight" "so long as it describes the justifications for withholding the information with specific detail, demonstrates that information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith[.]" *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 715 F.3d 937, 940–41 (D.C. Cir. 2013) (per curiam) (internal quotation marks omitted). While "any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent," "[u]ltimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Am. Civil Liberties Union v. U.S. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011) (internal quotation marks omitted).

> a. *The Hardy Declaration establishes that classification was done in accordance with Executive Order 13526's procedural requirements.*

There are two sets of documents relevant here. The first set of documents was created before Labow's FOIA request. The second set was created, and subsequently classified, after Labow's FOIA request. 2d Hardy Decl. ¶ 7(b). Labow argues that both sets of documents— Labow 200–04, 328–35, 441–45, and 1444–50—were classified after his initial request for documents, and thus the government was required to "establish[] that the individual or individuals who classified these documents had the authority to do so under § 1.7(d) of Exec. Order No. 13,526." Pl.'s Mem. at 3–4. The government disputes that the dates the plaintiff

8

identifies as the classification dates on the first set of documents were in fact "notations made by RIDS as part of its review in the course of processing Plaintiff's FOIA requests." Reply at 4 (citing 2d Hardy Decl. ¶ 7). In particular, the Hardy Declaration notes that Labow 441–45 was classified in 2001 and Labow 200–04 was classified 2008, both before Labow's FOIA request. 2d Hardy Decl. ¶ 7(a); *see Judicial Watch*, *Inc.*, 715 F.3d at 943 (rejecting Judicial Watch's claim that the images were not classified until after the FOIA request because "the CIA has averred that the images were in fact classified before it received the appellant's FOIA request, and there is no evidence to the contrary" (internal citations omitted)).

In any event, even if the first set of documents was classified after Labow's FOIA request, the Hardy Declaration explains that both sets of documents were classified in accordance with the classification requirements in Executive Order 13526, were classified on a document-by-document basis, and were classified "under the direction of the senior agency official described in § 5.4." 2d Hardy Decl. ¶ 8 (explaining that the documents were classified "under the direction of the senior agency official"); 1st Hardy Decl. ¶¶ 42–43 (explaining the procedural requirements of Executive Order 13526 that Hardy used to determine whether the documents were properly classified both in terms of the procedural and substantive requirements and explaining his conclusion that the documents were properly classified).[3] Aside from an

---

[3] The Second Hardy Declaration also argues that "[i]f § 1.7(d) were found to apply to documents that had not even been created at the time of a FOIA request, it would create an unnecessary and unintended burden on an agency." 2d Hardy Decl. at 5 n.5. However, the text of Executive Order 13526 does not create an exception for documents created after the FOIA request, but merely states "[i]nformation that has not previously been disclosed to the public under proper authority may be *classified or reclassified* after an agency has received a request for it under the Freedom of Information Act . . . only if such classification meets the requirements of this order and is accomplished on a document-by-document basis with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under section 5.4 of this order." Exec. Order 13526 § 1.7(d) (emphasis added). Indeed, the section seems to contemplate that original classification—as

unsupported assertion that the government "has not established that the individual or individuals who classified these documents had the authority to do so," Pl.'s Mem. at 4, Labow has offered no reason to doubt the government's good faith or its explanation that the latter documents were classified in accordance with Executive Order 13526.

      *b.* *The government properly classified the withheld information as pertaining to "foreign government information" or to "foreign relations or foreign activities," and thus properly withheld such information from disclosure.*

Here, Hardy has amply shown that the withheld information is exempt from disclosure under Section 552(b)(1). "Foreign government information" is defined as "information provided to the United States Government by a foreign government or governments, an international organization of governments, or any element thereof, with the expectation that the information, the source of the information, or both, are to be held in confidence." Exec. Order 13526 § 6.1(s); 1st Hardy Decl. ¶¶ 44–52.

Labow makes two arguments with respect to foreign government information: first, he argues that the government "provides no information upon which it can be determined whether the foreign government had an expectation that the information, the source of the information, or both, were to be held in confidence," and second, he argues that "the definition of 'foreign government information' does not extend to the mere identity of the foreign government." Pl.'s Mem. at 5–6. However, Hardy explains the expectation of confidence of the information, *e.g.*, 1st Hardy Decl. ¶ 46–52 ("The cooperative exchange of intelligence information between the foreign governments and the FBI was, and continues to be, with the express understanding that the information will be kept classified and not released to the public."), and the Executive Order

opposed to reclassification—would nevertheless be subject to this provision if the classification decision comes after the FOIA request. However, as is explained above, because Hardy has sufficiently established that the withheld and redacted documents were properly classified under Section 1.7(d), the Court need not decide whether Section 1.7(d) applies in the first place to documents created after an information request.

itself permits the source of the foreign government information to be classified. Exec. Order 13526 § 6.1(s). Moreover, Hardy's explanation of the harm, 1st Hardy Decl. ¶¶ 46–52, 67–68, is both plausible and logical and thus is entitled to great deference. *Judicial Watch, Inc.*, 715 F.3d at 941; *see also Baez v. U.S. Dep't of Justice*, 647 F.2d 1328, 1335–36 (D.C. Cir. 1980) (finding that the agency's affidavit sufficient because it explained the harm that would result from disclosing information the agency had agreed expressly not to reveal). Indeed, Executive Order 13526 itself notes that "[t]he unauthorized disclosure of foreign government information is presumed to cause damage to the national security." Exec. Order 13526 § 1.1(d).

With respect to information that pertains to "foreign relations or foreign activities of the United States," Labow argues that the government provided an "insufficiently detailed" explanation "to show that the redacted information relates to 'foreign relations or foreign activities of the United States.'" Pl.'s Mem. at 6. Labow argues that "foreign relations or foreign activities of the United States" must be more than merely information "about or from a foreign country;" instead, Labow argues, for Exemption 1 to apply, the redacted information must "reveal information from a foreign intelligence agency or reveal cooperation with a foreign intelligence agency." *Id.* (emphasis omitted). The D.C. Circuit, however, has not interpreted "foreign relations or foreign activities" so narrowly. Rather, so long as "unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security . . . and it pertains to . . . foreign relations or foreign activities of the United States," then the information is appropriately classified under Executive Order 13526. *See* Exec. Order 13526 § 1.4; *Judicial Watch, Inc.*, 715 F.3d at 941–43. Indeed, the D.C. Circuit has noted that "'pertains' is not a very demanding verb." *Judicial Watch, Inc.*, 715 F.3d at 941 (quoting *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 857 F. Supp. 2d 44, 60 (D.D.C. 2012) (concluding that records that

"were the product of a highly sensitive, overseas operation that was conducted under the direction of the CIA" pertained to the United States' foreign activities)).  Furthermore, the agency will not be required to provide more detail that it already has because "[t]he release of further detail could well impair legitimate secrecy needs and thus defeat the purpose of the exemption."  *Baez*, 647 F.2d at 1336–37 (explaining the harm that could result from requiring the government to provide more information about the "type of intelligence cooperation" with foreign governments).

Labow argues that under DOJ's reading of the exemption, entirely "innocuous data such as the type found in the CIA's World Factbook or an atlas" would be properly classified and thus withheld under Executive Order 13526.  But Labow ignores the requirement that the information must also cause "identifiable or describable damage to the national security."  Exec. Order 13526 § 1.4.  Here, Hardy explains that the information withheld in Labow 441–46 "contains sensitive intelligence information gathered by the United States either about or from a foreign country" and that disclosure of such information "can reasonably be expected to lead to diplomatic or economic retaliation . . . [,] and identify the target, scope, or time frame of intelligence activities of the United States in or about a foreign country."  1st Hardy Decl. ¶¶ 67–68.  This information "about or from" a foreign country certainly "pertains" to foreign relations or foreign activities of the United States" since it is "about or from" foreign countries, and Hardy's explanation of a national security harm, *e.g.*, 1st Hardy Decl. ¶ 68, is both logical and plausible.  The type of information that Hardy describes is more than "innocuous data of the type found in the CIA's World Factbook or an atlas" and is thus properly withheld under Section 552(b)(1).

c. *The government appropriately withheld information about intelligence activities, intelligence sources, or methods under Exemption 1.*

Finally, Hardy explains that Labow 201–02, 204, 330, 441–46, 980–90, 1054–1057, and 1444–50 all had been withheld because the documents "contain[] detailed intelligence activity information gathered or compiled by the FBI about a specific individual or organization of national security interest." 1st Hardy Decl. ¶ 56.[4]  Labow responds that "Hardy does not provide a reasonable explanation for the potential harm." Pl.'s Mem. at 7.

Yet, "[t]he assessment of harm to intelligence sources, methods and operations is entrusted to the Director of Central Intelligence, not to the courts," *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990),[5] and, accordingly, "the government's burden is a light one." *Am. Civil Liberties Union*, 628 F.3d at 624.  Rather, "in the FOIA context, we have consistently deferred to executive affidavits predicting harm to national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003).  Indeed, "the decisions of the Director, who must of course be familiar with the whole picture, as judges are not, are worthy of great deference given the magnitude of the national security interests and potential risks at stake." *CIA v. Sims*, 471 U.S. 159, 179 (1985).  "This is necessarily a region for forecasts in which informed judgment as to potential future harm should be respected." *Gardels v. CIA*, 689 F.2d 1100, 1106 (D.C. Cir. 1982).  Ultimately, "[t]he test is not whether the court personally agrees in full with the CIA's

---

[4] The government also invoked Exemption 3, explained *infra*, claiming that the National Security Act of 1947 exempts disclosure.

[5] Though the <u>Fitzgibbon</u> court specifically discuss deference to the CIA, the D.C. Circuit has recognized that this deference extends broadly to other executive department's agency affidavits because of the agency's expertise. *E.g.*, *McGehee v. Casey*, 718 F.2d 1137, 1148 (D.C. Cir. 1983) (explaining that "courts are to 'accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record' because 'the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of a particular classified record.'" (quoting S. Rep. No. 93–1200, at 6267 (1974)).

evaluation of the danger—rather, the issue is whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility in this field of foreign intelligence in which the CIA is expert and given by Congress a special role." *Id.* at 1105.

Keeping those principles in mind, it is difficult to conclude that the government has failed to meet its "light" burden to justify its withholding. Hardy explains that disclosure of the withheld and redacted information would "reveal the actual intelligence activity or method utilized by the FBI against a specific target; disclose the intelligence-gathering capabilities of the method; and/or provide an assessment of the intelligence source penetration of a specific target during a specific period of time." 1st Hardy Decl. ¶ 56. While Labow critiques this as a "generalized justification" that is a "recycled copy-and-paste" of language used previously, Pl.'s Mem. at 9, Hardy goes on to discuss the particular types of information that it withheld, such as the "character and/or title of case," the "acronym that identifies a specific intelligence method utilized by the FBI in its intelligence activities," and the "intelligence sources." 1st Hardy Decl. ¶¶ 57–66. Hardy also explains specifically the nexus between the redactions and the categories of information withheld and national security. 2d Hardy Decl. ¶¶ 9, 57–66. Hardy's explanation with respect to each of these justifications logically predicts a plausible national security harm and is tailored to the information withheld here. *E.g.*, *Coldiron v. U.S. Dep't of Justice*, 310 F. Supp. 2d 44, 54 (D.D.C. 2004) (granting the government summary judgment because the declaration "provides enough detail to allow the court to find that it has properly invoked Exemption 1" despite a "generic" "identification of the withheld information"). Labow offers no

evidence in the record that supports a different conclusion, nor has he pointed to any bad faith[6] on the part of the government.

While Labow complains that the government failed to provide specific information—such as "the title, the author, the subject matter, the nature of the document, date, header or footer, or any identifying information at all," Pl.'s Mem. at 11—as is explained above, the agency must "describe the document withheld [with] as much information as possible *without thwarting the exemption's purpose*," *King v. U.S. Dep't of Justice*, 830 F.2d 210, 224 (D.C. Cir. 1987) (emphasis added), and an agency may be justified in providing only a general description of the information in order to preserve the exemption's purpose. *See Keys v. U.S. Dep't of Justice*, 830 F2d 337, 349–50 (D.C. Cir. 1987) (explaining that coded *Vaughn* indexes provide sufficient specificity); *Baez*, 647 F.2d at 1336–37; *Coldiron*, 310 F. Supp. 2d at 54. Here, Hardy explained that "[i]t is my judgment that any greater specificity in the descriptions and justifications set forth with respect to information relating to foreign government relations or

---

[6] Labow claims bad faith by alleging that the agency is "attempt[ing] to insulate itself from any meaningful review" and points to the fact that the government "initially claimed there were no documents for Mr. Labow, upheld that decision on administrative appeal, then after the lawsuit was filed, admitted the existence of 572 pages and a DVD relating to Mr. Labow." Pl.'s Mem. at 10, 13–14. This is insufficient to show bad faith given Hardy's unrebutted explanation that the additional documents were released when (1) the agency expanded its search outside the "indices to the Central Records System," and (2) after documents and information were no longer protected by an exemption because the pending investigation closed. 1st Hardy Decl. ¶¶ 6–7, 11, 24, at 4 n.2. Labow provides no reason to doubt this explanation or to conclude that the government acted in bad faith. *See Baez*, 647 F.2d at 1333, 1333 n.24 ("General allegations of agency bad faith in other instances—either hypothetical or actual—will not undermine the veracity of the agency's affidavit submitted in support of its classification decision."); *cf. Bonner v. U.S. Dep't of Justice*, 928 F.2d 1148, 1153 (D.C. Cir. 1991) (finding that, with respect to a case where the court reviewed a representative sample of the FOIA documents withheld, "[i]f the sample uncovers no excisions or withholding improper when made, then the agency's action ordinarily should be upheld"); *Meeropol v. Meese*, 790 F.2d 942, 959 (D.C. Cir. 1986) ("The fact that there are documents which while properly withheld at the time the decision to withhold was made were nevertheless not exempt under *new* standards does not indicate error[.]"). If anything, the government's reprocessing of Labow's FOIA request and the subsequent release of documents that were no longer exempt demonstrates the government's good faith.

foreign activities and intelligence sources and methods of the United States could reasonably be expected to jeopardize the national security of the United States." 1st Hardy Decl. ¶ 70. Given the government's explanation of the harms that could result from revelation of the information that Labow seeks, the government has amply justified its application of Exemption 1, and the government is entitled to summary judgment on the documents withheld under Exemption 1.[7]

B. Exemption 3

Under Exemption 3, records that are "specifically exempted from disclosure by statute (other than section 552b of this title), if that statute —(A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph" are exempt from production. 5 U.S.C. § 552(b)(3). In turn, the FBI claims that 18 U.S.C. § 3123, Issuance of an order for a pen register or trap and trace device, Federal Rule of Criminal Procedure 6(e), The Grand Jury, and 50 U.S.C. § 3024(i)(1), Responsibilities and authorities of the Director of National Intelligence (also known as the National Security Act of 1947) all protect the information from disclosure.

> a. *Labow fails to raise an independent challenge to the government's withholding under the National Security Act of 1947, thus the government's rationale for applying the exemption stands unrebutted.*

Under 50 U.S.C. § 3024(i)(1) ("National Security Act"), the Director of National Intelligence is directed to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). Labow does not contest that the National Security Act is a proper withholding statute under 5 U.S.C. § 552(b)(3). *See generally* Pl.'s Mem.

---

[7] Plaintiff requests that the court conduct an *in camera* review of the documents withheld under Exemptions 1 and 3, but, as is explained above, because the affidavit sufficiently supports application of the exemptions, an *in camera* review is unnecessary.

Labow does, however, challenge the government's use of the National Security Act to justify withholding and redacting information under the FOIA based substantially on the same grounds as his challenge to the government's use of Exemption 1. *See* Pl.'s Mem. at 1–3,7 n.6, 7–12 (discussing Exemption 1 and Exemption 3, with respect to the National Security Act, together and explaining that "because the two exemptions involve a similar standard of reasonableness, they will be discussed here together"). As is discussed above, *supra* at 12–15, Labow's challenge on those grounds is unsuccessful, and while Labow notes that the government ostensibly "withheld two documents citing Exemption 3-3 without Exemption 1," Pl.'s Mem. at 1, Labow did not independently discuss how the government improperly applied the National Security Act to apply Exemption 3. Accordingly, summary judgment on this issue is warranted.

> b. *The government properly withheld information under the Pen Registers statute.*

Under 18 U.S.C. § 3123,

> [a]n order authorizing or approving the installation and use of a pen register or a trap and trace device shall direct that (1) the order be sealed until otherwise ordered by the court; and (2) the person owning or leasing the line or other facility to which the pen register or a trap and trace device is attached, or applied, or who is obligated by the order to provide assistance to the applicant, not disclose the existence of the pen register or trap and trace device or the existence of the investigation to the listed subscriber, or to any other person unless otherwise ordered by the court.

§ 3123(d). Other courts have held that § 3123 is a predicate statute for withholding information under Exemption 3. *E.g.*, *Sennett*, 962 F. Supp. 2d at 283; *Brown v. FBI*, 873 F. Supp. 2d 388, 401 (D.D.C. 2012); *Roberts v. FBI*, 845 F. Supp. 2d 96, 101–02 (D.D.C. 2012).

Labow contends that, because "the defendant has not produced any information from which this Court can determine whether any pen register order was ever under seal, much less

whether it currently is," the government has failed to justify its withholding. Pl.'s Mem. at 34.[8]

The government, however, has already provided sufficient information: the government

describes the material being withheld—information about the "identities and phone numbers of

the individuals subject to pen registers in this case—and the statute provides unequivocally that

such orders "shall" "be sealed until otherwise ordered by court," 18 U.S.C. § 3123(d)(1).

Because sufficient evidence justifying the withholding under Exemption 3 has already been

provided, supplementation is unnecessary.[9]

       *c.*   *The government appropriately withheld information that would disclose grand jury matters.*

Federal Rule of Criminal Procedure 6(e) prohibits disclosure of grand jury matters, Fed.

R. Crim. P. 6(e)(2)(B), and it has been recognized as a "statute" for the purposes of Exemption 3.

*Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 867 (D.C. Cir.

1981). This rule was enacted to "preserve the traditional rule of grand jury secrecy within

certain limited exceptions." *Id.* at 868. As such, any information that would "'disclose matters

occurring before the grand jury'" is protected under Exemption 3. *Id.* at 869 (quoting Fed. R.

Crim. Pro. 6(e)(2)). Importantly,

> [i]n order to effectuate the[ Rule's] objectives, the scope of the secrecy is necessary broad. It encompasses not only the direct revelation of grand jury transcripts but also the disclosure of information which would reveal "the identities of witnesses or jurors, the substance of testimony, the strategy or

---

[8] Labow also contends that "[t]he 60 days authorization period for use of the pen register statute has long since elapsed," *id*., but Labow fails to articulate the relevance of this statement. Insofar as he is suggesting that the 60 day authorization period somehow limits the sealing period, that contention has no support in the statutory text, as § 3123 provides that the orders remain sealed until "otherwise ordered by the court" rather than once the 60 day authorization period lapses.

[9] Labow's other arguments are similarly unavailing as Labow fails to provide case law to support his argument that the Pen Register statute permits the FBI to disclose this information, particularly in light of the other courts that have found that the Pen Register statute is an appropriate predicate statute. *See Sennett*, 962 F. Supp. 2d at 283 (citing cases).

direction of the investigation, the deliberations or the questions of the jurors, and the like."

*Id.* (quoting *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 (D.C. Cir. 1980)).  Information that is "coincidentally before the grand jury," *id.* at 870, but would "not reveal what has occurred before the grand jury," *Dresser Indus.*, 628 F.2d at 1383, however, is not protected under either Federal Rule of Criminal Procedure 6(e) or Exemption 3.

Hardy explains that the government withheld "the investigative files contain[ing] information about the names of recipients of federal grand jury subpoenas; information that identifies specific records subpoenaed by a federal grand jury; and copies of specific records provided to a federal grand jury in response to federal grand jury subpoenas."  1st Hardy Decl. ¶ 74.  As Hardy explains, the government withheld these documents because it would "expose the inner workings of the grand jury and violate the secrecy of grand jury proceedings by revealing the focus and scope of the grand jury's investigation."  2d Hardy Decl. ¶ 11.  Labow, on the other hand, contends that the government "did not provide any detail to allow this court to determine whether the specific records at issue in this case would in fact reveal the inner workings of the grand jury."  Pl.'s Mem. at 37.  This information, however—such as the identities of those subpoenaed, identities and descriptions of requested records, and records produced in response to the subpoenas—clearly all fall within Rule 6(e) because it would "tend to reveal . . . the strategy or direction of the investigation" and is not merely "information coincidentally before the grand jury."  *Senate of the Commonwealth of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987).  Notably, Hardy also explained that "documents obtained by the FBI independently of a grand jury were not withheld pursuant to Exemption 3. . . .  To the extent that any such documents were presented to a grand jury, they were not withheld merely because of such presentation."  2d Hardy Decl. ¶ 11.  As such, the

government has provided a sufficient basis to conclude that it properly withheld the documents that would "expose the inner workings of the grand jury" while not applying Exemption 3 to the documents that were "coincidentally before the grand jury." Accordingly, the government justifiably withheld information under Exemption 3 and Federal Rule of Criminal Procedure 6(e).

C. Exemption 7

Under Exemption 7, "records or information compiled for law enforcement purposes" are exempt from disclosure "only to the extent that the production of such law enforcement records or information," *inter alia*,

> (A) could reasonably be expected to interfere with enforcement proceedings . . .
> (D) could reasonably be expected to disclose the identity of a confidential source
> . . . wh[o] furnished information on a confidential basis, and, in the case of a
> record or information compiled by criminal law enforcement authority in the
> course of a criminal investigation or by an agency conducting a lawful national
> security intelligence investigation, information furnished by a confidential source
> [or] (E) would disclose techniques and procedures for law enforcement
> investigations or prosecutions, or would disclose guidelines for law enforcement
> investigations or prosecutions if such disclosure could reasonably be expected to
> risk circumvention of the law[.]

5 U.S.C. § 552(b)(7). As an initial matter, Labow does not contest that any of the withheld documents or redacted information are "records or information compiled for law enforcement purposes" within the meaning of § 552(b)(7).

> a. *The government properly applied Exemption 7(A) to withhold documents that may interfere with enforcement proceedings.*

Exemption 7(A) permits an agency to withhold information or documents if the law enforcement records "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). To make a successful 7(A) claim, the government "must therefore demonstrate that disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated." *Citizens for Responsibility & Ethics*

*in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1096 (D.C. Cir. 2014) (internal quotation marks omitted). "Categorical withholding is often appropriate under Exemption 7(A)." *Id.* at 1098. "In such a case, an agency may satisfy its burden of proof by grouping documents into categories and offering generic reasons for withholding the documents in each category." *Id.* (internal quotation marks omitted). To do this, the agency must (1) "define its categories functionally," (2) "conduct a document-by-document review in order to assign documents to the proper category," and (3) explain to the court how the release of each category would interfere with enforcement proceedings." *Id.* (internal quotation marks omitted).

Here, the government:

> asserted this exemption to protect information about plaintiff that appears in cross-references to a pending investigative file. The pending investigative file is not maintained in plaintiff's name; rather, it is indexed and maintained in the name of another individual. Specifically Exemption 7(A) has been asserted to protect the name and/or identifying information of the subject of a pending investigation and details concerning the pending investigation.

1st Hardy Decl. ¶ 89 (footnote omitted). The government's description of the functional category is vague and substantially repeats the statutory language, *see* Def.'s Mem. at 32 (identifying the "categories of information withheld under Exemption 7(A)" as "information which, if disclosed, could reasonably be expected to interfere with pending enforcement proceedings"); Hardy Decl. ¶ 36. The First Hardy Declaration provides a bit more clarity and states that

> the categories of information that the FBI has protected under Exemption 7(A) are: various records relating to surveillance conducted during the investigation; grand jury materials; classified information; law enforcement database printouts; interview summaries (FD-302s); evidence-related documents (*e.g.*, property receipts; chain-of-custody documents); and administrative forms that reveal the focus and scope of the investigation, evidence collected or to be collected, and investigative techniques being utilized.

1st Hardy Decl. at 43 n.31.  However, the government does not then "explain to the court how

the release of *each category* would interfere with enforcement proceedings," *Citizens for

Responsibility & Ethics*, 746 F.3d at 1098 (emphasis added).  Without either individualized and

detailed descriptions of the withheld and redacted documents or a clear description of a workable

functional category, as well as a tailored explanation for how each category or document would

interfere with an enforcement proceeding, it is difficult for the Court to assess the applicability of

Exemption 7(A).  Nevertheless, despite these inadequacies in the government's declaration, the

government has averred that it has a pending investigation in which "the subject is unaware of

the investigation" and that it thus "protected responsive records from that investigation pursuant

to Exemption 7(A)."  3d Hardy Declaration ¶ 5.  As such, the functional category of information

could be construed as information regarding the pending investigation.  The government then

sufficiently explains how the release of such information could adversely impact the prospective

case.  *E.g.*, 1st Hardy Dec. ¶ 90 (explaining that the "premature" release of the information

"would adversely affect the pending investigation" because, the "information concerning the

investigation could reach the individual who is under investigation" and may lead to other

particularized harms such as witness intimidation or destruction of evidence).[10]  While the

government's affidavit leaves much to be desired, it has provided sufficient essentials for the

Court to conclude that release of these law enforcement records could adversely impact an

---

[10] Labow asserts that the subject of the pending investigation is William White, Pl.'s
Mem. at 23 ("The file Defendant seeks to completely exempt from disclosure likely contains the
investigation of William White."), but Labow provides no record support for this assertion and
thus it has no bearing on the Court's decision.  *Cf. Pub. Emps. for Envtl. Responsibility v. Office
of Sci. & Tech. Policy*, 881 F. Supp. 2d 8, 18 (D.D.C. 2012) (rejecting the plaintiff's
"hypothesi[s] that the redacted information contains segregable factual information" and finding
that "[t]his is simply not enough to overcome the presumption of good faith afforded an agency's
declarations").

impending enforcement proceeding.  Accordingly, the defendant's motion for summary

judgment on its use of Exemption 7(A) will be granted.

      b.  *The government appropriately withheld information under Exemption 7(D) to prevent disclosure of either the identity of a confidential source, or information furnished by that source.* [11]

Exemption 7(D) allows an agency to withhold information or documents if the law

enforcement records "could reasonably be expected to disclose the identity of a confidential

source . . . wh[o] furnished information on a confidential basis" or that would reveal

"information furnished by a confidential source."  5 U.S.C. § 552(b)(7)(D).  "A source is

confidential within the meaning of exemption 7(D) if the source provided information under an

express assurance of confidentiality or in circumstances from which such an assurance could be

reasonably inferred."  *Williams v. FBI*, 69 F.3d 1155, 1159 (D.C. Cir. 1995) (internal quotation

marks omitted).  However, "it is not enough for the [FBI] to claim that all sources providing

information in the course of a criminal investigation do so on a confidential basis."  *Roth v. U.S.

Dep't of Justice*, 642 F.3d 1161, 1184 (D.C. Cir. 2011); *U.S. Dep't of Justice v. Landano*, 508

U.S. 165, 173 (1993) (rejecting a presumption of confidentiality for all sources that speak to the

FBI).  "If the FBI's production of criminal investigative records could reasonably be expected to

disclose the identity of such a confidential source or information furnished by such a source, that

ends the matter, and the FBI is entitled to withhold the records under Exemption 7(D)."  *Roth*,

642 F.3d at 1184–85 (internal quotation marks omitted).

Here, the government withheld six categories of information, two under an implied

assurance of confidentiality—"names, identifying information about, and/or information

provided by sources under implied assurances of confidentiality" and "names of, identifying

---

[11] As an initial matter, the DOJ reports that "all information previously withheld solely under Exemption 7(D) in [Labow 154, 158–59, and 659] has been released."  Def.'s Response to Pl.'s Notice of Supp. Auth. at 2.

information about, and/or information provided by local law enforcement under implied assurances of confidentiality—and four under express assurances of confidentiality. Under express assurances of confidentiality, the government withheld "the permanent source symbol number of a confidential source of the FBI," "the confidential source file number of a permanent confidential source of the FBI," "the names, identifying information about, and information provided by third parties to the FBI and/or law enforcement during the course of the investigations at issue here" and "information provided to the FBI from a foreign agency or authority." Def.'s Mem. at 36 n.25.

> ### i. The government sufficiently demonstrated that information was given under an express assurance of confidentiality.

If the FBI alleges an express assurance of confidentiality, "it must, in order to permit meaningful judicial review, present sufficient evidence that such an assurance was in fact given." *Id.* Here, the FBI has met its burden by showing that it provided an express assurance of confidentiality to the source symbol number informants, and to other third parties or foreign agencies providing information. 1st Hardy Decl. ¶ 97 (explaining that "[t]he FBI assigns permanent source symbol numbers in sequential order to confidential informants who report information to the FBI on a regular basis pursuant to an express assurance of confidentiality"); ¶ 100 ("In this case, these individuals, who provided specific and detailed information that is singular in nature, specifically requested that their identities not be revealed due to fear of reprisal. The FBI and/or law enforcement officials expressly promised these third-parties that their identities and the information they provided would not be disclosed."); ¶ 101 ("[T]he FBI protected information provided to the FBI from a foreign agency or authority with an explicit understanding of confidentiality."). Labow fails to directly challenge that this information was provided by or could identify a source who was given an express assurance of confidentiality,

*see* Pl.'s Mem. at 26–32 (discussing only whether the source gave information under an implied assurance of confidentiality), and thus the government is entitled to summary judgment, *see, e.g.*, *Roth*, 642 F.3d at 1185.

> ii. The Roth *factors weigh in favor of finding that the sources provided information under an implied assurance of confidentiality.*

Under *Roth v. United States Department of Justice*, the D.C. Circuit instructed that, if there was not an express assurance of confidentiality, then the courts must consider "the character of the crime at issue, the source's relation to the crime, whether the source received payment, and whether the source has an ongoing relationship with the law enforcement agency and typically communicates with the agency only at locations and under conditions which assure the contact will not be noticed." *Id.*

On the one hand, the Hardy Declaration indicates that the source provided "specific detailed information that is singular in nature concerning a subject of the FBI's domestic terrorism investigation of the 2008 vandalism of the Four Seasons hotel." 2d Hardy Decl. ¶ 14. This is similar to the statement in *Roth*, where the D.C. Circuit found that, despite the "conclusory" nature of the statement, the source likely spoke with the implied promise of confidentiality because of the type of the information given to the investigators. *See Roth*, 642 F.3d at 1186 (noting that "the *Vaughn* index states that the source discussed in Roth/Bower 254 and 256 'provided specific detailed information that is singular in nature concerning the criminal activities involving [Bower], his associates, and/or other subjects of [the FBI's investigation]'"). Additionally, the nature of the crime—an extremist anarchist protest involving property destruction[12]—weighs in favor of finding that the source likely spoke "with an understanding

---

[12] Labow portrays the crime as a "petty vandalism" and explains that "Labow was a bystander and since the disclosures demonstrate that he was never arrested for any alleged crimes to compare this investigation to cocaine trafficking or 'gang-related murder' would be

that the communication would remain confidential," *Landano*, 508 U.S. at 172. *See also Mays v. Drug Enforcement Admin.*, 234 F.3d 1324, 1330 (D.C. Cir. 2000) ("[A]n informant is at risk to the extent the criminal enterprise he exposes is of a type inclined toward violent retaliation."); 1st Hardy Decl. ¶ 103 (explaining the potential consequences of revealing a source in an extremist investigation); 2d Hardy Decl. ¶ 14 ("In the FBI's experience, sources providing information to the FBI about extremist activities, including anarchist extremism specifically, do so at great peril to themselves and have faced retaliation and threats (including death threats) when their assistance to the FBI has been publically disclosed."). Furthermore, the source was "identified as someone who was 'not in the position to testify,' meaning that the source was not intended to serve as a Government witness in the event of a prosecution, but rather that the FBI intended to maintain the source's confidentiality so that s/he could be a source of information in similar cases in the future due to his/her knowledge about and access to individuals involved in extremist activities." 2d Hardy Decl. ¶ 14. Unlike in *Sennett*, where the declaration failed to provide "some mention of the source's relation to the crime," 962 F. Supp. 2d at 286, here, the Second Hardy Declaration explains that "[t]he source here was not personally involved in the 2008 vandalism of the Four Seasons Hotel, but was able to provide information to the FBI to assist its efforts to identify those individuals who were involved in the vandalism due to the source's involvement and familiarity with individuals involved in extremist activities in the

---

unreasonable." Pl.'s Mem. at 28. However, the government explained the scope and character of its investigation as a domestic terrorism investigation, which may transcend Labow's involvement in the matter he characterizes as "petty vandalism." Whether Labow was arrested or charged with any crimes does not obviate the potential danger to a source in a domestic terrorism investigation because the danger does not necessarily emanate from Labow, but may come from others who may not want the source to reveal additional information or as retaliation for previously revealed information.

Washington D.C. area." 2d Hardy Decl. ¶ 14.[13]  Finally, Hardy attested that "this source, whose identity and information the FBI protected, provided information to the FBI over a period of time that regularly proved to be reliable," indicating that the source has an ongoing relationship with the law enforcement agency, *see Roth*, 642 F.3d at 1184.

On the other hand, though Hardy does not attest to whether the informant was paid, the government seems to concede that the source is unpaid.  *See* Reply at 15 (not contesting the plaintiff's assertion that the sources are unpaid, but rather focuses on Labow's subsequent inferences); 2d Hardy Decl. ¶ 16 (explaining that "the FBI regularly relies on confidential sources who voluntarily and willingly provide information without compensation").  The government also does not present evidence regarding the circumstances of its meetings with the informant.

On balance, though the Hardy Declarations do not address the locations and conditions under which the source met with the FBI and the government concedes that the source was not paid, the factors weigh in favor of finding that the source spoke with the expectation of confidentiality.  *See Miller v. Dep't of Justice*, 872 F. Supp. 2d 12, 27 (D.D.C. 2012) (identifying the nature of the crime and the informant's relation to the crime as the most important factors under a *Roth* analysis).  The type of information provided and the type of crime at issue as well as the source's relation to the crime and the source's relationship with the police all indicate that

---

[13] Here, Labow contends that Sennett did not provide information under an implied promise of confidentiality because of "Sennett's stated intention to publicize evidence of the alleged crime."  Pl.'s Mem. at 28.  However, this assertion rests on Labow's speculation that Sennett was the confidential source.  This speculation is insufficient to defeat summary judgment based on the agency's affidavit absent other evidence indicating that the source did not speak with the implied assurance of confidentiality.

the source spoke with an expectation of confidentiality.  Accordingly, summary judgment will be

granted to the government on this issue.[14]

   c. *The government appropriately withheld information that may reveal techniques and procedures for law enforcement investigations or prosecutions under Exemption 7(E).*

  Under Exemption 7(E), the government may withhold law enforcement records that

"would disclose techniques and procedures for law enforcement investigations or prosecutions,

or would disclose guidelines for law enforcement investigations or prosecutions if such

disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C.

§ 552(b)(7)(E).  "The first clause of Exemption 7(E) affords categorical protection for techniques

and procedures used in law enforcement investigations or prosecutions."  *Pub. Emps. for Envtl.*

*Responsibility v. U.S. Section of Int'l Boundary & Water Comm.*, 839 F. Supp. 2d 304, 327

(D.D.C. 2012) (citing *Showing Animals Respect & Kindness v. U.S. Dep't of Interior*, 730 F.

Supp. 2d 180, 199–200 (D.D.C. 2010); *Allard K. Lowenstein Int'l Human Rights Project v.*

*Dep't of Homeland Sec.*, 626 F.3d 678, 681 (2d Cir. 2010) ("The sentence structure of

---

[14] Labow also makes a number of other arguments that are without merit.  For example, he argues that 7(D) protects only information that could disclose the identity of a confidential source.  Pl.'s Mem. at 29–31.  This assertion is mistaken as Exemption 7(D) also protects "informed furnished by a confidential source," 5 U.S.C. § 552(b)(7)(D), and merits no further discussion.

  Labow also argues that the government "may not assert an implied assurance of confidentiality to protect the identity of sources who were forced to testify."  Pl.'s Mem. at 31–32.  Labow contends that "it is fair to assume [the confidential sources] likely fall into one of two categories.  Either they are undercover police or they are former members or affiliates of the activities groups in question, whose cooperation is being coerced with the threat of prosecution."  *Id.* at 31.  Labow then speculates that the FBI "refuse[s] to provide an express assurance of confidentiality" to assure that sources will continue to provide information, and asserts that "it would be wrong to allow the FBI to assert an implied promise when they had withheld an express assurance as a tactic to pressure a source."  *Id.* at 32.  Labow's assertions are not based on the record.  Labow fails to factually support his assertions that the source here was forced to cooperate with the government; more importantly, Labow fails to provide case law supporting his assertion that if the source was in fact coerced, that has bearing on Exemption 7(D)'s applicability.  *See id.* at 31–32.

Exemption (b)(7)(E) indicates that the qualifying phrase ('if such disclosure could reasonably be expected to risk circumvention of the law') modifies only 'guidelines' and not 'techniques and procedures.'"). "Exemptions 7(E)'s second clause separately protects 'guidelines for law enforcement investigations or prosecutions if [their] disclosure could reasonably be expected to risk circumvention of the law." *Public Emps.*, 839 F. Supp. 2d at 327.

The government has cited this section in withholding nine categories of information: (1) "investigative techniques and procedures," (2) "dates and types of investigations (preliminary or full investigations)," (3) "database information and/or printouts," (4) "computer analysis response team ('CART') reports and/or data," (5) "location and identity of FBI and/or joint units," (6) "information concerning the installation, locations, monitoring, and types of devices utilized in surveillance," (7) "collection and analysis of information," (8) "sensitive file numbers," and (9) "FBI secure fax number, internal e-mail address and/or non-public web address." 1st Hardy Decl. at 15–16. It is unclear exactly which subcategories under Exemption 7 Labow contests, *see* Pl.'s Mem. at 14–22, but the gist of Labow's attack is that the government cannot redact "investigative techniques that are well known to the public,"[15]

---

[15] There is some ambiguity as to whether Exemption 7(E) protects only investigative techniques and procedures that are "generally unknown to the public." *Compare Albuquerque Pub. Co. v. U.S. Dep't of Justice*, 726 F. Supp. 851, 857–58 (D.D.C. 1989) ("[T]his exemption pertains to investigative techniques and procedures generally unknown to the public.") *and Malloy v. U.S. Dep't of Justice*, 457 F. Supp. 543 (D.D.C. 1978) (exploring the legislative history) *with Soghoian v. U.S. Dep't of Justice*, 885 F. Supp. 2d 62, 74 (D.D.C. 2012) (approving the DOJ's withholding of information about electronic surveillance despite plaintiff's argument that "defendant has failed to show that the records describe techniques not generally known to the public"); *Showing Animals Respect & Kindness*, 730 F. Supp. 2d at 199 (same). Ultimately, because the government not only attests that these are investigative techniques and procedures but also that these withheld portions relate to specific details that are generally unknown to the public, it is unnecessary to resolve whether, categorically, investigative techniques and procedures that are generally known to the public are protected under Exemption 7(E). Labow's related argument that disclosure of techniques that "could not possibly help criminals evade the

particularly when disclosure could not possibly help criminals evade the law," and that Exemption 7 does not protect techniques that are "not currently in use." *Id.* at 15–16.

Any deficiencies that may have existed in the First Hardy Declaration have been remedied by the Second Hardy Declaration. For example, in the Second Hardy Declaration, the government averred that "[t]he FBI protected non-public details about the specific methods and procedures for conducting such surveillance, including the circumstances and conditions under which it is conducted, the targets of the surveillance, and other operation details about the technique." 2d Hardy Decl. ¶ 18; *see also* 2d Hardy Decl. ¶ 20 (explaining that the details, such as "from whom the information was collected, what information was and was not collected, [and] how it was collected," was protected as "not publically-known" information). Indeed, even in the First Hardy Declaration, Hardy acknowledged that "it is publically known that the FBI and other law enforcement agencies engage in different types of surveillance in investigation." 1st Hardy Decl. ¶ 114. However, Hardy then explained that that the information withheld was "non-public details about when, how, and under what circumstances the FBI conducts surveillance." *Id.* Further, Hardy explains that the information that it withheld is about "currently-used law enforcement technique related to intelligence gathering that is itself classified." 2d Hardy Decl. ¶¶ 17, 19. Hardy's second declaration has clarified that it was the non-public details about the investigative techniques that have been withheld, and that the information withheld is about currently used techniques, and thus the government is entitled to summary judgment for its use of Exemption 7(E).[16]

---

law" is contrary to the statutory text as that prong is not required to withhold information that would reveal law enforcement techniques or procedures. *See supra* at 27.

[16] Moreover, though not entirely clear in Labow's opposition, it appears that Labow does not challenge some of the subcategories under Exemption 7(E) that the government maintains are protected, such as the "dates and types of investigations (preliminary or full investigations),"

D. Exclusion under § 552(c)

After reviewing all the materials submitted with the government's motion for summary judgment and Labow's opposition, as well as the government's *ex parte* declaration, the Court concludes that, if an exclusion was in fact employed, it was, and continues to remain, amply justified.

E. Segregability

In *Johnson v. Executive Office for the U.S. Attorneys*, the D.C. Circuit found that a comprehensive *Vaughn* index and an affidavit explaining that the affiant had "personally conducted a line-by-line review of each document withheld in full and determined that 'no documents contained releasable information which could be reasonably segregated from the nonreleasable portions'" was "sufficient" to meet the agency's burden with respect to segregability. 310 F.3d 771, 776 (D.C. Cir. 2002). In *Johnson*, the D.C. Circuit further affirmed the district court's reliance on the affiant's "conclusion as to the nonsegregability of portions of other documents." *Id.* at 777. Here, Hardy explained the withholdings for individual documents and attested that "[o]nce all exempt information under all exemptions was excised, there was no non-exempt information that could be reasonably segregated and released." 2d Hardy Decl. ¶¶ 10, 15, 25. He further explained that "the FBI conducted an extensive document-by-document, line-by-line review and analysis of each document responsive to plaintiff's request to identify and separate exempt from non-exempt information" and that, after applying "all applicable exemptions" "the only non-exempt information that was left in documents/portions of

---

the "computer analysis response team ('CART') reports and/or data," or "sensitive file numbers," among others. *See* Pl.'s Mem. at 15–22 (discussing the applicability of Exemption 7(E)). The government's motion for summary judgment will also be granted to the extent that Labow did not challenge the government's rationale for withholding information in certain subcategories under Exemption 7(E).

documents that were withheld consisted of random words or phrases which taken separately or together had minimal or no informational content." *Id.* ¶ 25. Labow has not pointed to inconsistencies in the record, nor has he proffered any reason to doubt this declaration. Accordingly, the Court finds that the Second Hardy Declaration sufficiently describes the segregability analysis undertaken and provides adequately detailed justifications for the non-segregability of the documents.

### F. Labow's remaining arguments

Labow argues that because the government has recently released information "into the public domain in the *Sennett* case," the government may not continue to withhold documents originally withheld from him when the government processed his FOIA requests in 2011 and 2012. Pl.'s Mem. at 38. He provides no citation justifying this assertion, nor any analysis as to what information has been released to the public domain. *See Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983) (outlining the plaintiff's burden when he claims a prior disclosure). Labow also asks that the Court require the defendant to reprocess Labow's FOIA request to "determine whether there is any additional releasable materials in this case." Pl.'s Mem. at 38. Even if there are now "additional releasable materials," Labow is not entitled to reprocessing because he has not shown that the government erroneously withheld the information when it processed his request in 2011 and 2012. *Cf. Meeropol*, 790 F.2d at 959 (finding that despite a change in the operative executive order, "[t]he fact that there are documents which while properly withheld at the time the decision to withhold was made were nevertheless not exempt under *new* standards does not indicate error. . . . The government cannot be expected to follow an endlessly moving target"); *Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1153 (D.C. Cir. 1991) (explaining that court should not require an agency to reprocess a FOIA request despite a

change in circumstance *absent an error in the first instance* because "[u]nless the [agency] unlawfully withheld information in its prior responses, a court has no warrant to place [a FOIA requester] at the head of the current [agency] FOIA queue" (emphasis added)).  Here, Labow has failed to show that the government misapplied any of the FOIA exemptions, that the FOIA exemptions were otherwise inapplicable, or that he is otherwise entitled to reprocessing.

For the reasons given in this Memorandum Order, the Court will **GRANT** Defendant's Motion for Summary Judgment [32].

September 4, 2014

_____

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE